UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIAN LAMAR WILLIAMS,

    Petitioner,

    v.

A.A. LAMARQUE,

    Respondent.

No. C 04-1680 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition will be denied.

**BACKGROUND**

Petitioner, Brian Lamar Williams, was convicted of first degree murder with special circumstances, attempted robbery, and assault with a firearm. He was sentenced to state prison for life without parole and a consecutive ten-year determinate term. The judgment was affirmed on appeal by the Court of Appeal of California and the Supreme Court of California denied his petition for review.

The following facts are from the opinion of the California Court of Appeal. *See* Ex. 4 at 1-3.[1]

---

[1] Citations to "Ex." are to the exhibits in the state court record lodged with the court by the attorney general.

On the evening of July 1, 1997, when Williams was with his friends Rodney H. and Donald C. at a McDonald's restaurant, Donald C. proposed that they "go rob somebody." The three drove around in Williams' car until they saw a group of "four Mexicans" standing outside and Donald C. said, "That's them." Williams parked and the three approached a group that included Anthony Franklin (sitting on a bicycle) and teenagers Daniel Ochoa, William P. and Raymond G., who were standing outside William P.'s house. Williams and his friends first walked by this group without saying anything. Rodney H. walked on to the street corner, saying he would "be the watchout man," while Williams and Donald C. circled back to the group.

Williams approached, asking where a girl lived, and Raymond G. started to leave. Williams said, "Give me your money," and then hit Raymond G. in the head with a gun. Raymond G. ran toward William P.'s house and hid his money. Williams and Ochoa started arguing. Williams then shot Ochoa in the head at close range. Ochoa slumped onto Franklin's bicycle, but Franklin freed the bike and rode away. Williams, Donald C. and Rodney H. also ran away. Near Ochoa's body lay a .40 caliber shell casing, which was determined to have been fired from a Glock 23 semiautomatic pistol.

The day after the shooting, Ochoa's brother Elias telephoned the police and identified Williams as the shooter. Elias explained he had been told "[t]hose kids who were there knew who did it." The police arrested Williams and Donald C. the next day. In Williams' bedroom, the police found a variety of ammunition, including a .40 caliber round. They later recovered the pistol used in the shooting at the home of Bobby Williams, an individual who is not related to Brian Williams. When Williams was jailed after his arrest, a detective told him he was going to conduct a gunshot residue test. Williams immediately scrubbed his hands in the toilet bowl of his cell and began to cry.

Williams was charged, and the matter was prosecuted as a capital offense. Witnesses at trial described two previous robberies in which Williams allegedly participated. In both, the victims were hit and forced to surrender their bicycles. In addition, the prosecution presented evidence suggesting Williams, Rodney H. and Donald C. were associated with a North Richmond gang called the Project Trojans. A detective testified to his opinion that the crimes in this case were gang-related.

Williams' defense disputed his identification as Ochoa's killer and challenged the prosecution's claim that the shooting occurred as part of a robbery. The defense elicited testimony suggesting Williams and his friends approached the group outside William P.'s house to buy "weed." The boys began arguing and Ochoa unzipped his jacket in what appeared to be a threatening manner. Someone then shot Ochoa, but it was not clear that person was Williams. Although Franklin identified Williams as the shooter, he was very intoxicated and possibly under the influence of drugs at the time.

Ex. 4 at 1-3.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's

adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2001), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 123 S. Ct. 1029, 1041 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 123 S. Ct. at 1041. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.*

///

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 123 S. Ct. at 1041; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, in this case that of the California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

## DISCUSSION

As grounds for habeas relief, petitioner asserts that: (1) his Sixth Amendment rights were violated because the jury was not drawn from a fair cross-section of Contra Costa County citizens; (2) a jailhouse confession should have been excluded because it was the fruit of a confession to police which was obtained in violation of *Miranda* and which was involuntary; (3) his trial counsel was ineffective in specified ways; and (4) his appellate counsel was ineffective.

**I.  Jury Venire**

Williams claims that the jury selection process in Contra Costa County violated his right to have his jury drawn from a representative cross-section of the community.  A criminal defendant has a constitutional right stemming from the Sixth Amendment to a fair and impartial jury pool composed of a cross-section of the community. *Holland v. Illinois*, 493 U.S. 474, 476 (1990)

In *Duren v. Missouri*, 439 U.S. 357 (1979), the Supreme Court held that to establish a prima facie violation of the fair cross-section requirement, a defendant must show that (1) the group alleged to be excluded is a "distinctive" group in the community, *see, e.g., United States v. Cannady*, 54 F.3d 544, 547 (9th Cir. 1995) (African-Americans, Hispanics and Asians are distinct groups); (2) the group was not fairly represented in the venire from which the petit jury was chosen *see, e.g., United States v. Nelson*, 137 F.3d 1094, 1101 (9th Cir. 1998)(representation constitutionally sufficient where absolute disparity between

4

proportion of Hispanics in the community and proportion of Hispanics in the jury pool was 3.9%); *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996) (requiring "absolute disparity" between number of persons from distinctive group in jury pool in relation to number of such persons in community and finding that 4.9% absolute disparity was insufficient to make out claim); *Cannady*, 54 F.3d at 548 (representation constitutionally sufficient where absolute disparity below 7.7%); and (3) the underrepresentation resulted from a systematic exclusion of the group in the jury selection process, *see, e.g., United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985) (no systematic exclusion when only 30% of grand jury members and only 42% of venire were women, absent showing that under-representation of women occurred generally in other venires). *See Duren*, 439 U.S. at 367.

Under the test established in *Duren*, disproportionate exclusion of a distinctive group from the venire need not be intentional to be unconstitutional, but it must be systematic. In *Duren* itself, women were, unlike men, able to opt out of jury service by filling out a paragraph in the questionnaire sent to them. Further, women who did not return the questionnaire were presumed to have opted out; the same presumption did not apply to men. *Id.* at 362. The Court concluded that "the resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the system by which juries were selected." *Id.* at 367.

As the state court noted, it is undisputed that black persons constitute a cognizable group under *Duren*. *Thomas v. Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998). Petitioner thus established the first prong of his prima facie showing.

The trial court here also concluded that petitioner had demonstrated that blacks were underrepresented in Contra Costa County jury pools, thus satisfying the second prong of *Duren*, by applying a comparative disparity test. Ex. 4 at 4. However, that test is "strongly disfavored in the Ninth Circuit on the ground that it exaggerates the effect of any deviation." *Thomas*, 159 F.3d at 1150. For purposes of applying the federal "fair cross-section" requirement, the Ninth Circuit has adopted an "absolute disparity" analysis.

*Esquivel*, 88 F.3d at 726. The "absolute disparity" is determined by subtracting the percentage of the group in the jury pool from that group's percentage of the relevant total population. *Id.* While California courts use several different tests to determine the degree of under-representation of minorities on jury venires, in federal habeas corpus proceedings attacking state convictions the Ninth Circuit's absolute disparity test is applied. *Thomas*, 159 F.3d at 1150. Applying the absolute disparity test, the disparity is between an African-American population in the county of between 8.1 and 8.4 percent and 4.6 percent African-Americans on Contra Costa County jury venires. Ex. 4 at 4. The absolute disparity thus is between 3.5 and 3.8 percent. In view of cases permitting absolute disparity below 7.7%, the exclusion of a group constituting 7.7% or less of the total population is, standing alone, generally insufficient to establish a prima facie case of systematic exclusion. *Rich v. Calderon*, 170 F.3d 1236, 1239-40, amended, 187 F.3d 1064, 1068 (9th Cir. 1999). Petitioner thus has failed to meet the second prong of the *Duren* test.

As to the third prong, petitioner conceded that "the county's selection procedures are facially race-neutral," but contended that the showing of twenty years of under-representation of blacks on Contra Costa County venires was sufficient to make a prima facie showing of systematic exclusion. Ex. 4 at 5-6.

A showing that a jury venire under-represents an identifiable group is, without more, an insufficient showing of systematic exclusion. *Randolph v. California*, 380 F.3d 1133, 1141-42 (9th Cir. 2004) (under-representation of identifiable group not alone enough to show systematic exclusion under third prong; no probative evidence under-representation of Hispanics due to system county used to assemble venire). If under-representation by itself were sufficient to support a holding of unconstitutionality, the second and third prongs of *Duren* would effectively collapse into one inquiry. As the California Court of Appeal held, Williams cannot satisfy the third prong of *Duren* because he has failed to present any evidence that the under-representation of African-Americans is due to the system Contra Costa County uses to assemble the venire. Ex. 4 at 5. Because Williams has not shown any relationship between the disproportionately low percentage of African-Americans in the

6

venire and the juror-selection system the county uses, he has not shown that the underrepresentation of African-Americans is, as *Duren* requires, "inherent in the particular jury-selection process." *Duren*, 439 U.S. at 366.

Petitioner's Sixth Amendment "fair cross-section" right thus was not violated, and the state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly-established United States Supreme Court authority.

## II.     Admission of Jailhouse Recording

Petitioner contends that admission of a recording of a jaiilhouse conversation violated his constitutional rights.  The California Court of Appeal set out the factual background of this claim thus:

> This conversation took place on the heels of a four-hour-long interrogation, during which detectives repeatedly ignored Williams' expressed desire to speak with an attorney and not answer their questions. After the interrogation, detectives placed Williams in a jail cell. Williams then started talking with Donald C., who was being held approximately 30 to 35 feet away in a booking cell. Due to the noise in the facility and the distance separating them, Williams and Donald C. had to shout at each other; thus, their conversation was largely audible to the records staff sitting nearby. One detective, who could hear the shouting, placed a tape recorder in the hallway near Williams' cell. He did not allow Williams to see the tape recorder.
>
> Although the trial court excluded all statements Williams made during the police interrogation on the grounds that they were coerced and obtained in violation of Miranda v. Arizona (1966) 384 U.S. 436 [FN3. The prosecutor conceded the Miranda violations, which, as the trial court observed, were numerous and egregious.], the court rejected Williams' claim that his tape recorded conversation with Donald C. should also be suppressed. Most of Williams' arguments below focused on the surreptitious nature of the recording, which Williams claimed violated his statutory and constitutional rights to privacy, due process and freedom from unlawful searches and seizures. Based on the public nature of the jailhouse, the volume of the men's voices and the fact that a detective had recently been in the vicinity, the trial court concluded Williams could have had no reasonable expectation of privacy in his conversation with Donald C. The court also rejected the defense argument that police violated Williams' Fifth Amendment right against self-incrimination because, having told Williams he would have a chance to speak with Donald C. and then placing Williams and Donald C. within earshot of each other, the police engaged in conduct designed to elicit incriminating statements.

Ex. 4 at 7-8.

During his trial, Williams alleged that the jailhouse officer's conduct in recording the conversation between Williams and Donald C. was the functional equivalent of police

7

interrogation and a continuation of the earlier questioning.  On appeal and here, Williams argues that the conversation should have been excluded as the fruit of the previous unlawful coercive interrogation.

**A.     Procedural default**

The California Court of Appeal held that counsel's failure to object to admission of the jailhouse recording on the "fruit of the poisonous tree" ground barred that claim on appeal, because if the trial court had been timely alerted it could have cured any error.  Ex. 4 at 10.  Respondent contends that the state court's invocation of procedural default bars the "fruit of the poisonous tree" claim here.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  The procedural default rule is a specific instance of the more general "adequate and independent state grounds" doctrine.  *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or if he can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  In order to establish that a fundamental miscarriage of justice would result from an application of procedural default a petitioner has to prove factual innocence.  *Gandarela v. Johnson*, 275 F.3d 744, 749-50 (9th Cir. 2002); *Wildman v. Johnson*, 261 F.3d 832, 842-43 (9th Cir. 2001).

The state bears the burden of proving the adequacy of a state procedural bar.  *Bennett v. Mueller*, 296 F.3d 752, 763 (9th Cir. 2002).  "Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner.  The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the

8

inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's." *Id.* at 762.

The respondent has adequately pled the existence of an independent and adequate procedural bar. Under *Bennett* this shifts the burden to the petitioner. *See* 296 F.3d at 762. He has, however, not demonstrated the inadequacy of the state procedure to serve as a bar, for instance by providing citations showing inconsistent application. That California's contemporaneous objection rule operates as a procedural bar has been recognized by the Ninth Circuit. *Davis v. Woodford*, 384 F.3d 628, 653-54 (9th Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999). Petitioner having made no attempt to show cause and prejudice for the default, or to show that failure to consider the claim will result in a fundamental miscarriage of justice, the court concludes that this claim is barred by the procedural default. However, the court will also consider the merits of the claim below, as an alternative ground for the result.

**B.    Merits**

Williams claims the taped conversation should have been excluded because it was tainted "fruit" of the prior, coercive interrogation. The trial court held both that petitioner's statement to police was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that it was involuntary. Ex. 11 at 543-44 (*Miranda* ruling); *id.* at 680, 683 (voluntariness).

The "fruit of the poisonous tree" doctrine does not apply to evidence discovered as a result of *Miranda* violations. *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion) ("fruit of the poisonous tree" doctrine does not apply to *Miranda* violations); *id.* at 645 (Kennedy and O'Connor, JJ, concurring in the judgment) (admission of nontestimonial physical evidence does not run risk of admission of coerced incriminating statements; in light of evidentiary value of physical evidence, "doubtful" that exclusion could be justified by deterrence rationale). Thus, the only question here is whether the jailhouse recording should have been suppressed as the fruit of involuntary statements.

The "fruit of the poisonous tree" doctrine generally prohibits the admission at trial of evidence, both physical and verbal, that is derived from illegal government acts. *Brown v. Illinois*, 422 U.S. 590, 598 (1975) (*citing Wong Sun v. United States*, 371 U.S. 471, 484-88, 1963)). Although the "fruit of the poisonous tree" doctrine developed in the context of the Fourth Amendment, the Fifth Amendment also provides a basis for use of the exclusionary rule: incriminating statements involuntarily made must be excluded. *Brown*, 422 U.S. at 601. Exclusion is not required, however, when "the connection between the illegal statement and the evidence . . . had "become so attenuated as to dissipate the taint." *Wong Sun*, 371 U.S. at 487. "[N]ot . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun v. United States* at 487-488; *see Nardone v. United States*, 308 U.S. 338, 340 (1939) (holding challenged evidence had "become so attenuated as to dissipate the taint.").

Here, as in *Wong Sun*, the connection between the illegal interrogation and the subsequent recorded jailhouse conversation between Williams and Donald C. was so attenuated as to dissipate the taint of the initial unlawful practices of the officers. *Id.* The conversation between the two suspects occurred in a different area, some time after the interrogation, and in circumstances where there clearly was no privacy. Under these circumstances, the California Court of Appeal's conclusion that the tape was admissible was not a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal Law," as is required for habeas relief under 28 U.S.C. § 2254(d)(1).

The California Court of Appeal also held that admission of the tape was harmless beyond a reasonable doubt, applying the correct standard set out in *Chapman v. California*, 386 U.S. 18 (1967). Ex. 4 at 10-11.

///

When the state court disposed of a constitutional error as harmless under an appropriate standard of review, federal courts must, for purposes of application of the "unreasonable application" clause of § 2254(d)(1), first determine whether the state court's harmless error analysis was objectively unreasonable. *Medina v. Hornung*, 386 F.3d 872, 878 (9th Cir. 2004); *see, e.g., Campbell v. Rice*, 408 F.3d at 1173 (determining that state court's harmlessness holding was not unreasonable and proceeding no further). If the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the *Brecht* analysis. *Medina*, 386 F.3d at 877.

This is what the court of appeal said about the harmless error question:

> Having reviewed a transcript of the recorded conversation, we agree with the Attorney General that the evidence was trivial. Williams made very few intelligible statements, the only possibly significant one being, "That's (unintelligible) think I pulled the trigger, from you"-which the prosecutor referred to in his closing argument as "sound[ing] like" Williams saying " 'They found out I pulled the trigger from you.' " This statement is hardly an admission of guilt, as Williams now contends. In contrast, the evidence of William's guilt from other sources was quite strong. An eyewitness (Franklin) identified Williams as Ochoa's shooter, and Williams' own conduct in scrubbing his hands in a toilet before taking a gunshot residue test also suggested he pulled the trigger.

Ex. 4 at 10-11.

This was not an objectively unreasonable harmless error analysis. For this additional reason, petitioner cannot obtain habeas relief on this claim.

### III. Effective Assistance of Trial Counsel Claims

Williams alleges that he was denied effective assistance of trial counsel. To the extent his assertions are intelligible, petitioner is not entitled to relief.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* The right to effective assistance of counsel

11

applies to the performance of both retained and appointed counsel without distinction. *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Williams (Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000).

The defendant must show that counsel's representation fell below an objective standard of reasonableness. *See Strickland,* 466 U.S. at 688. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689. It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

Where the defendant is challenging his conviction, the appropriate question on the prejudice prong is "'whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'" *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695).

///

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Also, a lawyer need not file a motion that he knows to be meritless on the facts and the law. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (to show prejudice under *Strickland* from failure to file a motion, petitioner must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him); *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action can never be deficient performance).

### A.     Failure to Argue Involuntariness

At trial, petitioner sought to suppress the jailhouse recording discussed above, contending that the circumstances of its making "violated his statutory and constitutional rights to privacy, due process and freedom from unlawful searches and seizures," and that it violated his Fifth Amendment right against self-incrimination because the police conduct was "designed to elicit incriminating statements." Ex. 4 at 8. As has been noted above, on appeal he contended that introduction of the recording violated his right not have evidence used which was "fruit of the poisonous tree," namely an involuntary confession. *Id.* One ground for the court of appeal's rejection of this claim, again discussed above, was that it was procedurally barred by counsel's failure to object on the ground raised on appeal. *Id.* at 10. Now petitioner contends that counsel was ineffective in failing to object on the fruit/involuntariness theory.

The court has concluded above that there was no constitutional error because any taint of involuntariness was attenuated, and also that admission of the tape was harmless. As a result, counsel's failure to object on this ground was not deficient performance, because the objection would have failed, *see Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (counsel's performance not deficient for failing to file merit less motion), and for

13

the same reason, even if his performance was deficient it was not prejudicial.

### B. Failure to Seek Suppression of a Co-defendant's Identity

Williams also contends that his trial counsel was ineffective for failing to seek the suppression of the identity of Rodney H., as the product of the improper interrogation of petitioner by the police. Petitioner has failed to provide any factual basis for his contention that Rodney H.'s identity was discovered only as a result of the concededly-improper interrogation. He therefore has failed to show that counsel was deficient or that he was prejudiced.

### C. Failure to Seek Suppression of Co-defendant's Testimony

Petitioner also contends that his counsel was ineffective in not moving to suppress the trial testimony of Rodney H. on grounds that it was the product of a coercive interrogation of Rodney H. First, petitioner has failed to show that there was a coercive interrogation of Rodney H. Secondly, as respondent points out, *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), is controlling. In that case the court held that appellant lacked standing to assert the constitutional rights of a witness who he contended had been subjected to coercive interrogation. *Id.* at 1092. The court held that to make out a due process violation the appellant would have to show that the witness' actual "*trial*" testimony was involuntary. *Id.* at 1092 (italics in original). Petitioner has presented no evidence whatever that Rodney H.'s trial testimony was involuntary, so has failed to establish that counsel's performance was deficient or that he was prejudiced by counsel's failure to challenge it.

### D. Failure to Seek Suppression of Petitioner's Reaction to Gunshot Residue Test

After his arrest, Williams was informed that he would have to undergo a gunshot residue test. Williams immediately began to cry and scrubbing his hands in a toilet bowl in his cell. Ex. 4 at 2. Petitioner contends trial counsel was ineffective for not seeking to suppress this evidence because of a discovery violation. Petitioner's counsel did make such a motion. Ex. 12 at 3339. This claim therefore is without merit.

14

### E. Failure to Seek Suppression of Eyewitness Testimony as Product of Coerced Statement by a Third Party

Petitioner contends that his counsel should have sought to suppress the eyewitness testimony of Anthony Franklin, who was present during commission of the murder, contending that the identity of this witness was only obtained through the coercive questioning of the witness' brother, McKenzie Franklin. There is absolutely no factual support for the contention that McKenzie was coerced or that the police learned Anthony's identity from McKenzie. This claim therefore is without merit.

## IV. Ineffective Assistance of Appellate Counsel

Williams contends he was denied effective assistance of appellate counsel because counsel did not raise as an issue the trial court's denial of his request for a mistrial as a result of the discovery violation mentioned above.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington. Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986). A defendant therefore must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. *Miller*, 882 F.2d at 1434 & n.9 (citing *Strickland*, 466 U.S. at 688, 694; *Birtle*, 792 F.2d at 849).

It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*, 882 F.2d at 1434 n.10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See id.* at 1434 (footnote and citations omitted). Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he

15

declined to raise a weak issue.  *See id.*

The prosecutor conceded that he had failed to provide part of a police report describing Williams' reaction to the gunshot residue test.  Ex. 12 at 3318.  An appellate challenge to the trial court's denial of the motion to exclude or for a mistrial would have been a weak issue.  The California Penal Code section under which the defense sought exclusion or a mistrial was section 1054.5.  *Id.* at 3319.  Subsection (c) of that statute provides that "[t]he court may prohibit the testimony of a witness pursuant to subdivision (b) [regarding failure to provide discovery] only if all other sanctions have ben exhausted."  Cal. Penal Code § 1054.5(c).  The trial court offered a continuance if the need for one could be shown and offered defense counsel a chance to examine the officer who saw petitioner washing his hands in the toilet and who wrote the report in the absence of the jury.  Ex. 12 at 3333.  Counsel declined both.  *Id.*  Under the statute, exclusion thus was not available.

It was not deficient performance for appellate counsel to fail to raise this weak issue, nor was the failure to do so prejudicial.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: October 1, 2007.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.04\williams680.RUL.wpd